**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **Case No. 21-cr-429-CRC** |
| | : | |
| SAVANNAH DANIELLE MCDONALD, | : | |
| | : | |
| Defendant. | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Savannah Danielle McDonald ("McDonald") to ninety days' imprisonment, followed by three years' probation, 60 hours of community service, and $500 restitution.

## I.    Introduction

The defendant, Savannah Danielle McDonald, and her friend, Nolan Kidd ("Kidd") (Case No. 21-cr-429-2 (CRC)),[1] participated in the January 6, 2021 attack on the United States Capitol— a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars' of property damage.[2]

---

[1] Kidd is scheduled to be sentenced by this Court on May 9, 2022.

[2] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

On January 18, 2022, McDonald pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building.  As explained herein, a sentence of ninety days' imprisonment, with probation to follow, is appropriate in this case because McDonald: (1) observed and cheered when a mob of rioters overran police on the Upper West Terrace Staircase; (2) entered the Capitol Building despite having been sprayed with tear gas three times by police officers; (3) was part of the first wave of rioters who entered the Capitol Building on January 6, and she entered through the Senate Fire Door less than 20 seconds after it was opened by other rioters; (4) spent approximately 40 minutes inside the Capitol Building on January 6, where she took videos bragging about being the only girl to make it to the Senate and having been tear gassed by police officers; (5) gave an interview shortly after exiting the Capitol Building and sent messages via social media that displayed a total lack of remorse; and (6) subsequently tried to hide evidence of her participation in the riot and provided false or misleading information to law enforcement, including claiming that police officers invited her through the doors of the Capitol.

The Court must also consider that McDonald's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the certification proceedings. But for her actions alongside so many others, the riot likely would have failed to derail those proceedings. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, McDonald's participation in a riot that actually succeeded in halting the Congressional certification combined with McDonald's celebration and endorsement of the violence on that day,

the substantial time she spent inside the Capitol, and her lack of remorse as demonstrated in social media messages and an interview, renders a ninety-day jail sentence appropriate in this case.

## II.      Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 37 (Statement of Offense), at ¶ 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to McDonald's conduct and behavior on January 6.

### McDonald's Role in the January 6, 2021 Attack on the Capitol

On January 4, 2021, McDonald and Kidd left their homes in Georgia to travel to Washington D.C. to attend the "Stop the Steal" rally. After attending the rally, McDonald and Kidd joined the crowd advancing on the U.S. Capitol. A photo of McDonald and Kidd, taken from inside the Capitol Building and found on Kidd's mobile telephone, is included below as Exhibit 1. As seen in Exhibit 1, on the day of the riot McDonald wore a black jacket and red beanie, while Kidd wore a dark jacket with two stripes over a red sweatshirt. Kidd is also wearing a United States Capitol Police (USCP) hat that Kidd took during the riot, and he is holding the red Make America Great Again hat that he wore for most of the day.



Exhibit 1.

After reaching the Capitol Grounds, McDonald and Kidd watched from the West Lawn while rioters swarmed through a police line and rushed up the stairs of the Capitol. Kidd recorded the moment on his mobile telephone and can be heard shouting "this has never happened before, they just broke through, the police had to retreat, they just broke the line" while in the background McDonald screamed "we are making history" and yelled encouragement. *See* Exhibit 2. A still image from the video is included below as Exhibit 2-1.

4



Exhibit 2-1.

Closed Caption Video (CCV) provided by USCP captured the moment rioters broke through the police line from a different angle. *See* Exhibit 3. In this video, rioters pelted the line of police officers with a variety of objects before they suddenly pushed through the line 48 seconds into the video. McDonald and Kidd then climbed up the same staircase, and crossed where the police line had been breached, approximately four minutes later. Due to a technical issue with the relevant USCP CCV camera, the recording is partially blurred around the time the McDonald and Kidd cross. However, McDonald can be seen in a still image from the video, included below as Exhibit 3-1, and Kidd's striped leather jacket is visible just in front of her, both circled in red.



Exhibit 3-1.

Kidd also took a video as he climbed the staircase with McDonald past where the police line had been breached. *See* Exhibit 4. In the video, Kidd narrates their movements, stating, "we broke through the line, policemen shooting, tear gassing, but we got it, we got it, we're in." A still image from the video is included below as Exhibit 4-1.



Exhibit 4-1.

6

As McDonald and Kidd moved on to the Upper West Terrace, they watched and recorded as rioters entered through the Senate Wing Door and adjacent windows, the first breach of the Capitol Building. Contrary to any claims that the doors were open to the rioters or that police let the rioters in, Kidd can be heard in the video yelling "they broke all the way through the door… they're goin in, look … you want to."  *See* Exhibit 5.  A still image from the video is included below as Exhibit 5-1.



Exhibit 5-1.

The initial breach at the Senate Wing Door and adjacent windows was also recorded by USCP CCV from inside the Capitol. A still image of the breach is provided below as Exhibit 6. The doors were subsequently forced open by rioters at 2:13:30 p.m.



Exhibit 6.

This breach was also captured from outside the Capitol by USCP CCV. *See* Exhibit 7. At 2:15:20 p.m., approximately 3:20 into Exhibit 7, McDonald and Kidd can be seen heading towards the entrance at the Senate Wing Door.  In the still image included below as Exhibit 7-1, McDonald and Kidd are circled and red, and an arrow points at the Senate Fire Door entrance to the Capitol Building, which was still closed.



Exhibit 7-1.

At approximately 2:16 p.m., two rioters who had entered through the Senate Wing Door broke open the Senate Fire Door from the inside. As captured in USCP CCV video, Kidd and McDonald entered the Capitol Building through the Senate Fire Door within 20 seconds after the door was opened. *See* Exhibit 8; *see also* Exhibit 7 at 4:00. Due to a technical issue with the USCP CCV camera, the recording begins to blur around 1 minute into the video.  However, McDonald and Kidd (circled in red) are visible in a still image from the video, included below as Exhibit 8-1, taken just after they entered the Capitol.



Exhibit 8-1.

After breaking into the Capitol Building, McDonald and Kidd remained inside "for approximately 40 minutes walking through various areas inside, including walking past the Senate Carriage Doors and taking the elevator to the third floor." *See* ECF 37 at ¶ 9. Once again, Kidd filmed and narrated their movements. Immediately after entering the building, and in apparent acknowledgment that they had no right to be there, Kidd yelled "this is the place very few

Americans ever get to see, we broke in, we own this building, this is our house, they can tear gas us all they want, we own it." *See* Exhibit 9. Kidd next recorded as they approached the Senate Carriage Door, and a rioter can be heard asking "why are they directing us" as officers try to move rioters toward the door. *See* Exhibit 10. McDonald and Kidd turned around when they realized that they were being led out of the Capitol Building, and Kidd yelled at the crowd to "turn it around." *Id*. A still image from that video is included below as Exhibit 10-1.



Exhibit 10-1.

USCP CCV footage also captured McDonald and Kidd as they approached the Senate Carriage Door. *See* Exhibit 11. Officers can be seen directing rioters to exit the Capitol, and some

of the other rioters exited through the Senate Carriage Doors. Instead of following the direction of

law enforcement, McDonald and Kidd turned around, but discovered that another police line had

formed at the intersection with the next corridor, preventing McDonald and Kidd from returning

back down the hallway. Rather than exiting the building as directed, McDonald and Kidd snuck

onto an elevator and traveled up to the third floor. In a video entitled "Storming the Capitol," which

is available at https://www.youtube.com/watch?v=LeRYX4LOzYw, McDonald and Kidd gave an

interview to the Young Patriots Society shortly after exiting the building (YPS Video).[3] At 7:50

in the YPS Video, Kidd states that they entered an elevator because law enforcement had "a hall

blocked off pretty early on." A still image from the USCP CCV footage is included below as

Exhibit 11-1, with McDonald and Kidd circled in red.



Exhibit 11-1.

---

[3] In the about section of the YPS News page on Youtube, which is available at
https://www.youtube.com/channel/UCrTNne5uzmnDP4_caxzwzNg/about, the group describes
itself as "a group of independent journalists documenting political events and protests in
Philadelphia, NYC, DC, and beyond."

After taking an elevator to the third floor of the Capitol Building, McDonald and Kidd were again directed to leave by a police officer. *See* Exhibit 12. However, McDonald and Kidd did not exit the building, and instead walked down only one flight of stairs. On the second floor, McDonald and Kidd stood and sat near another police line in the second-floor hallway for approximately 30 minutes. *See* ECF 37 at ¶ 9. In some of the iconic photos taken during the January 6 riot, included below as Exhibits 13-1, 13-2 and 13-3, McDonald and Kidd (marked in red) can be seen flanking the "Q Shaman" as rioters are held up in the hallway by a line of police officers.



Exhibit 13-1.[4]

---

[4] https://www.businessinsider.com/q-shaman-qanon-influencer-capitol-siege-washington-dc-protest-riot-2021-1



Exhibit 13-2.[5]



Exhibit 13-3.[6]

---

[5] https://www.insider.com/judge-orders-dc-jail-qanon-shaman-organic-food-jacob-chansley-2021-2

[6] https://www.washingtonpost.com/nation/2021/01/15/qanon-shaman-trump-kill-pardon/

Kidd recorded several more videos while in the hallway. In one, Kidd mocked police officers for saying the Capitol had been shut down due to COVID concerns, and also captured McDonald recording a Snapchat video of herself bragging about having been tear gassed three times. *See* Exhibit 14; *see also* Exhibit 13-3 (Kidd can be seen recording McDonald as she takes the video). In another video, McDonald and Kidd bragged that McDonald was "the only girl who made it into the Senate." *See* Exhibit 15. A still image from another, shorter video is included below as Exhibit 16.



Exhibit 16.

At approximately 2:53 p.m., the rioters in that area of the Capitol were directed to leave by law enforcement. McDonald and Kidd walked downstairs to the first floor, and subsequently exited the Capitol Building through the Senate Carriage Doors at approximately 2:55 p.m. However, McDonald and Kidd did not exit the Capitol Grounds at that time. Instead, they walked to the East

side of the Capitol, where they recorded additional videos and agreed to do an interview. *See supra*
at 11. During the interview, at 7:11 in the YPS video, McDonald bragged that they were "definitely
in the first 100 to 150 people" to make it inside the Capitol. That interview was spliced together
with video clips taken by Kidd, and the YouTube page states that "Videos inside Capitol courtesy
of Nolan Kidd." The interview ended with Kidd placing a USCP hat on his head while bragging
that he got a souvenir from the riot.

While McDonald did not express any remorse over her conduct during or immediately after
the riot, she subsequently realized that she might be legally culpable for her conduct. In a message
sent on January 7 to a private group on Snapchat, McDonald stated, "Look.  Everything needs to
be deleted and stopped being shared!  So let's make sure anyone it was sent to is asked to delete
it." ECF 37 at ¶ 13. Also on January 7, as shown below in the messages provided by Snapchat,
McDonald (XXXXXn2) stated that although her "chest hurt" because she was being investigated
by the FBI, "we did the right thing …  no matter how you look at it."

| XXXXXn2 | Really? | Thu Jan 07 17:09:27 UTC 2021 |
| XXXXXXX | I'm serious | Thu Jan 07 17:09:21 UTC 2021 |
| XXXXXXX | If we get any whiff of them getting on to y'all I can get y'all to Durango mexico in 2 days | Thu Jan 07 17:09:14 UTC 2021 |
| XXXXXn2 | No matter how you look at it | Thu Jan 07 17:09:14 UTC 2021 |
| XXXXXn2 | But we did the right thing | Thu Jan 07 17:09:08 UTC 2021 |
| XXXXXn2 | My chest hurts | Thu Jan 07 17:08:57 UTC 2021 |
| … | | |
| XXXXXn2 | Oh god | Thu Jan 07 16:59:46 UTC 2021 |
| XXXXXXX | Try not to have to use y'all's ID | Thu Jan 07 16:59:36 UTC 2021 |
| XXXXXXX | Well for once in my life 2 of my friends are wanted by FBI | Thu Jan 07 16:59:17 UTC 2021 |

In the same chat, Kidd bragged about their conduct, stating "Me and Savannah are
FUCKING STORMTROOPERS …  Maybe bout top 15 people . . . We weren't just there we went
farther than almost anyone into the building." ECF 37 at ¶ 12. Kidd made the comment in reference

to a screenshot of a Times of India post from January 6, 2021, that was also shared in the chat, and is included below as Exhibit 17.



Exhibit 17.

*McDonald's interview by the FBI*

On January 14, 2021, McDonald agreed to a voluntary interview with FBI agents. *See* ECF 37 at ¶ 12. During the interview, McDonald truthfully admitted to entering the Capitol Building and to having been tear gassed three times before she entered the building. *Id*. However, McDonald also misled investigators. Although McDonald admitted to sending photos and videos through her Snapchat account, she told investigators that she had deleted her account. *Id*. Through a subsequent search warrant to Snapchat, FBI learned that McDonald had not deleted her account, and had also engaged in group chats about the riot as described above. *Id*. at ¶ 13. McDonald also told investigators that there were uniformed police officers at the doors of the Capitol telling them to come inside and showing them where to go.

*The Charges and Plea Agreement*

On May 20, 2021, McDonald was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2); and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On June 11, 2021, she was arrested in Georgia. On June 24, 2021, McDonald was charged by four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On January 18, 2022, she pleaded guilty to Count Four of the Information, charging her with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in the Capitol Building. By plea agreement, McDonald agreed to pay $500 in restitution to the Department of the Treasury.

### III.     Statutory Penalties

McDonald now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, McDonald faces up to six months of imprisonment and a fine of up to $5,000. McDonald must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. Here, McDonald has admitted to being tear gassed multiple times before entering the Capitol Building. *See* ECF 37 at ¶ 11. As depicted in Exhibits 1-7, before entering the Capitol Building, McDonald watched and cheered as other rioters assaulted police, broke through a police line, and breached the Capitol. As McDonald and Kidd raced around the Capitol together, Kidd repeatedly described their conduct, and the conduct of the other rioters, as breaking into the Capitol. Clearly, McDonald knew she was breaking the law when she was in the Capitol Building. While no one who participated in the January 6 riot can plausibly claim to have been a tourist, McDonald is certainly not among the least culpable of the rioters.

Additionally, while looking at McDonald's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with,

18

or ignored commands from police officers; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had McDonald personally engaged in violence or destruction, she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish McDonald from most other misdemeanor defendants. McDonald's lack of violence and property destruction is the reason she was charged only with, and permitted to plead to, a misdemeanor rather than felony. However, what does distinguish McDonald (and Kidd) from most other defendants is the atypically high number of aggravating factors.

Before entering the Capitol Building, McDonald certainly observed violence. She watched as a mob of rioters assaulted law enforcement with thrown objects and cheered that they were making "history" when the mob suddenly pushed through the police line. She saw the destruction of property as other rioters broke open the Senate Fire Door and entered through the smashed-out windows by the Senate Wing Door. And, her unlawful conduct occurred after McDonald had already been tear gassed by law enforcement three times. As part of the first group to enter the Capitol, she would have crossed through numerous barriers and barricades, and seen smoke and clouds of tear gas, on her way to the Capitol Building. She even recorded a video inside the Capitol bragging about having been tear gassed by police officers.

Additionally, once inside the Capitol building, she ignored the directions of police officers to exit at the Senate Carriage Door and then snuck onto an elevator when she was trapped behind a new police line. Also, although McDonald left the third floor of the Capitol when confronted by

a police officer, McDonald walked down only one flight of stairs and spent another 25 minutes inside the Capitol Building.  Altogether McDonald spent 40 minutes inside the Capitol Building, and her presence, along with other rioters, had the desired effect of delaying the certification vote.

Finally, McDonald tried to hide evidence of her unlawful conduct after the riot, and misled investigators during an interview. Although McDonald shared recordings and commented about her participation in the riot via Snapchat, she told investigators that she had deleted her account. She also told investigators that uniformed police officers greeted them at the Capitol door and invited them inside. However, as captured by USCP CCV footage, there were no officers at the Senate Fire Door, which was broken open by rioters from the inside.  And, while there were uniformed officers at the Senate Carriage Doors, they directed McDonald to exit the building, a directive McDonald ignored.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  McDonald's History and Characteristics

As set forth in the PSR, McDonald is a 21-year-old woman who was born and resides in Georgia. PSR at ¶¶ 21 and 49. McDonald is a high school graduate and briefly attended a technical college. PSR at ¶¶ 60-61. McDonald is currently employed in a part-time position as a server at a restaurant. PSR at ¶ 63. McDonald has no prior criminal convictions. PSR at ¶ 35.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the

democratic process."[7] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

---

[7] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

McDonald's conduct on January 6, 2021, and boastful claims following the riot, demonstrate the need for specific deterrence for this defendant. It is bad enough that before she entered the Capitol she (i) watched and cheered the assault of police officers trying to hold the line on the Upper West Terrace Staircase, (ii) was tear gassed three times, and (iii) and witnessed the destruction of property at the Senate Fire Door and the broken out windows by the Senate Wing Door. But, after entering the Capitol, McDonald displayed pride in what she and other rioters had done. McDonald recorded videos where she bragged about having been tear gassed and claimed

22

to be the only woman to make it into the Senate. She gave an interview in front of the Capitol where she bragged about being one of the first 100-150 people into the Capitol. Even the day after the riot, once she had the opportunity to reflect on the enormity of what had transpired and knew she would be the subject of an investigation, McDonald still believed she did the right thing at the Capitol "no matter how you look at it."

The government acknowledges that McDonald has now accepted responsibility early by entering into this plea agreement. However, her actions during and immediately following the riot underscores the need for specific deterrence in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[8] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[9] Indeed, the government invites the Court to join Judge

---

[8] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[9] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in

Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have drawn meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, such as McDonald, merit serious consideration of incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

McDonald pleaded guilty to Count Four of the Information, charging her with Parading, Demonstrating, or Picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

---

this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the exact same balance of aggravating and mitigating factors present here, the Court should consider the sentence imposed on Kidd, who at the time of this filing is scheduled to be sentenced on May 9, 2022. McDonald and Kidd were

25

together throughout their time at the Capitol, and so witnessed the same assaults on police officers and spent the same amount of time inside the Capitol. McDonald and Kidd were equally proud of their conduct during the riot, as expressed in the videos they took inside the Capitol, the interview they gave outside the Capitol, and the messages they sent via Snapchat. There are, of course, some differences worth noting. For example, Kidd arguably had more of a leadership role as he loudly directed other rioters to "turn it around" rather than exiting at the Senate Carriage Door. Kidd also collected a trophy in the form of a USCP hat, which he has since turned over to the Government. On the other hand, while both McDonald and Kidd misled investigators, McDonald made demonstrably false statements when she claimed to have deleted her Snapchat account and told investigators that there were uniformed officers at the door to the Capitol who invited her in. Ultimately, the government believes their conduct is substantially similar, and has asked that the same sentence be imposed on both defendants.

The Court may also consider the sentence of Jennifer Ryan (No. 1:21-cr-00050 (CRC)), who pleaded guilty to 40 U.S.C. § 5104(e)(2)(G).  Like McDonald, Ryan gave public interviews celebrating her involvement in the riot. Like McDonald, Ryan also recorded videos where she celebrated breaking into the Capitol. There are differences as well. McDonald spent substantially more time actually inside the Capitol, and, while inside the Capitol, McDonald disobeyed the directions of law enforcement to exit the Capitol. Unlike Ryan, McDonald misled investigators and tried to hide evidence about her participation in the riot. McDonald was also part of the first wave to enter the Capitol Building, and she bragged about how far she went in the Capitol and her status as one of the first 100-150 people to enter the building. On the other hand, Ryan had a much larger social media presence and appeared to actively call for violence during the riot. Ryan also

continued to make comments well after the riot that indicated she did not feel remorse. This court ultimately sentenced Ryan to two months' jail time.

By way of contrast, this Court may want to consider the sentence of 36 months' probation given to John Clarence Wilkerson IV (Case No. 1:21-cr-00302 (CRC)). Wilkerson was sentenced for walking past barricades, watching rioters engage police at a police line, entering the Capitol approximately eight minutes after the Senate Wing Door was breached, and staying inside the Capitol Building for approximately fourteen minutes. While there are some similarities in conduct, McDonald also has far more aggravating factors. For example, while both McDonald and Wilkerson saw rioters assault police, McDonald was recorded cheering on that assault and claimed they were making "history." McDonald also spent almost three times as long as Wilkerson inside the Capitol Building, and refused to obey the directions of police officers to leave the Capitol. Unlike Wilkerson, McDonald gave an interview from the Capitol Grounds and bragged about being part of the first group into the Capitol Building. Additionally, unlike Wilkerson, McDonald subsequently lied to investigators, falsely claiming she had deleted her Snapchat account and that uniformed police officers had welcomed her at the door to the Capitol.

Similarly, this Court may want to consider the sentence of 14 days' incarceration given to Anthony Scirica (Case No. 1:21-cr-00457 (CRC)). Both McDonald and Scirica were inside the Capitol for over 30 minutes and observed rioters pushing against police officers. However, McDonald observed violence against officers (and was tear gassed three times) before she entered the Capitol Building, while Scirica did not observe violence until he was already inside. Additionally, while Scirica took several videos on January 6, including one where he chants U-S-A, McDonald was recorded shouting that they were making history as police were assaulted and bragged about having been tear gassed. McDonald also refused to obey the directions of police

officers to leave the Capitol, gave an interview from the Capitol Grounds, and directly lied to investigators.

The Court may also wish to consider the related cases of Erik Rau (Case No. 1:21-cr-00467(JEB)) and Derek Jancart (Case No. 1:21-cr-00148(JEB)). Both individuals pleaded guilty before Judge James E. Boasberg to 40 U.S.C. § 5104(e)(2)(D), Disorderly Conduct in the Capitol Building. Like McDonald, Rau and Jancart appeared to be ecstatic about being involved in the riot, and were recorded shouting, "we made it up to the Capitol … we have the police surrounded!  We have you surrounded!" *United States v. Rau*, 1:21-cr-00467 (JEB), ECF 13 at 3-4. Like McDonald, Rau may have intentionally tried to hide evidence, as Rau deleted texts from his phone that the FBI recovered through other means. Rau and Jancart also appear to have been in the Capitol Building for about the same time as McDonald. Judge Boasberg sentenced both Rau and Jancart to 45 days of imprisonment.

More generally, the United States has recommended, and judges have often imposed, jail time in cases where the defendant witnessed confrontations with law enforcement before entering the Capitol, or refused to follow the directions of law enforcement. *See, e.g.*, *United States v. Register*, 1:21-cr-00349 (TJK) (75 days' incarceration where the defendant waved the crowd towards an access point, entered the U.S. Capitol past broken windows and ignored officers' attempts to clear him and others from the building); *United States v. Frank Scavo*, 1:21-cr-254 (RCL) (60 days' incarceration where the defendant witnessed the violent breach of the East Rotunda Doors); *United States v. James Little*, 1:21-cr-315 (RCL) (60 days' incarceration and 36 months' probation where the defendant witnessed rioters clashing with police officers on the Capitol Grounds); *United States v. William Tryon*, 1:21-cr-00420 (RBW) (50 days' incarceration

where the defendant disregarded directions by police officers and remained inside the Capitol until he was forced to leave).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.     The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense. *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing a split sentence).

**A. A sentence imposed for a petty offense may include both incarceration and probation.**

*1. Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences." Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment). Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[10] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[11] As a general matter, therefore, "a judge must sentence a federal offender to either a

---

[10] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3563(b)(10). *See* Part II *infra*.

[11] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence." 18 U.S.C. § 3551(b).

fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

### 2. *Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617

F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).   In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL

768685, at *4.  But that limitation "does not extend" to a defendant sentenced to a petty offense.
*See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to
impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be
sentenced to a period of continuous incarceration and a term of probation.  *See United States v.
Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted
of a petty offense, was sentenced to two years of probation with the first six months in prison.  *Id.*
at 808.   In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3)
"[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term
of six months of continuous imprisonment plus probation."  *Id.* at 809; *see* Cyclopedia of Federal
Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in
conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the
defendant is being sentenced for a petty offense, a trial court may properly sentence such individual
to a term of continuous imprisonment for a period of time, as well as a sentence of probation.")
(citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th
ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time
to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only
"different offense."  *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section
3561(a)(3) functions as an adjective that modifies "offense").  Section 3561(a)(3) does not state
"the same *offense* or a different offense that is not a petty offense," which would imply that the
final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense."  The phrase
"that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated

phrase "the same or a different offense."  *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012).  Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited."  *Id.* at 148-49.  And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."  *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants.  *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense).  When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b).  *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific

statute will not be controlled or nullified by a general one."). As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Id.* This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section

3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence.   Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3).   *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense.   For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough.   *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).   Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation).   Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation).   No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.   The defendant pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine.   *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d

1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty

offender may face a sentence of up to five years in probation).

**B.  A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.**

*1.  Relevant background*

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563.

Among the discretionary conditions of probation a sentencing court may impose is a requirement

that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility"

to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983

WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over

weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement"

such as "for a week or two."  *Id.*[12]

*A.  Analysis*

A sentencing court may impose one or more intervals of imprisonment up to a year (or the

statutory maximum) as a condition of probation, so long as the imprisonment occurs during

"nights, weekends or other intervals of time."  18 U.S.C. § 3563(b)(10).  Although the statute does

not define an "interval of time," limited case law suggests that it should amount to a "brief period"

---

[12] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits.").  Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[13]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure.

---

[13] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison.  Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular."  1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

**VI.      Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Savannah Danielle McDonald to ninety days' incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on her liberty as a consequence of her behavior, while recognizing her early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:      /s/ *Benjamin Kringer*
Benjamin E. Kringer
Detailed to the U.S. Attorney's Office
for the District of Columbia
D.C. Bar No. 482852
555 Fourth Street, N.W.
Washington, DC  20530
benjamin.kringer2@usdoj.gov
(202) 598-0687