IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SAVANNAH DANIELLE MCDONALD | Case No.: 1:21-cr-00429-CRC-1 |

## SENTENCING MEMORANDUM ON BEHALF OF SAVANNAH MCDONALD

COMES NOW the Defendant, Savannah Danielle McDonald by and through her counsel, and herein files this sentencing memorandum, in order to provide necessary information, context and support for a reasonable sentence in this case. In support, she shows as follows:

### I. Presentence Report Objections

Ms. McDonald filed no objections to the Draft Presentence Report (DPSR)

### II. Argument for a Reasonable Sentence

In order to determine what is an appropriate and reasonable sentence, the court is required to consider both the factors as outlined by Congress in 18 U.S.C. §3553(a)(1), as well as the provisions of the properly calculated United States Sentencing Guidelines.

In this section Ms. McDonald, will advocate for a reasonable sentence in this case, and argue that a reasonable sentence in this case is a probationary one, for a number of reasons.

#### a. *Any Sentence Must Be Individualized to the Defendant*

A fundamental pillar of the sentencing process is the recognition that the punishment should consider both the crime of conviction, as well as the offender. *Williams v. New York*, 337 U.S. 241, 247 (1949). This determination includes the mandate that each sentencing judge view each case "as a unique study in the human failings that sometimes mitigate, sometimes magnify,

the crime and the punishment to ensue." *Koon v. United States,* 518 U.S. 81, 113 (1996). This principle has been codified by Congress into the United States Code in several areas, making it clear that there should be no limitation on a sentencing judge's ability to consider information relevant to the sentencing process, and mandating a consideration of the unique history and characteristics of each defendant. *See:* 18 U.S.C. § 3661; 18 U.S.C. § 3553(a)(1).

The Supreme Court has steadfastly reaffirmed a sentencing court's freedom, indeed its obligation, to consider the entire universe of facts in a defendant's life: "Permitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'" *Pepper v. United States*, 131 S. Ct. 1229, 1239-40 (2011). A district court must impose a sentence that is "sufficient but not greater than necessary" to meet the goals of the Sentencing Reform Act. 18 U.S.C. § 3553(a)(1).

18 U.S.C.A. § 3553(a) requires courts to consider the following factors:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed —

    A. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    B. to afford adequate deterrence to criminal conduct;

    C. to protect the public from further crimes of the defendant; and

    D. to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing guideline range;

  (5) any pertinent policy statements of the Sentencing Commission;

  (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

  (7) the need to provide restitution to any victims of the offense.

What this makes abundantly clear is that this Court, when considering what sentence is appropriate for Ms. McDonald in this case must Court look to Ms. McDonald, as an individual, and fashion a sentence which is appropriate for her and her alone. To that end, a reasonable review of Ms. McDonald's personal history and characteristics lead to the conclusion that a probationary sentence would be the reasonable and appropriate sentence in this case, while a sentencing involving incarceration would be greater than necessary.

  b. ***18 U.S.C. §3553(a) Factors***

Because 18 U.S.C. §3553(a)(1) dictates that the court must consider the history and characteristics of the defendant, it is important that the court remain aware of Ms. McDonald's background. A look at Ms. McDonald's life before, on and after January 6, 2021, shows a young woman from a small town who dipped her toe into the political waters, only to pull it back before the current dragged her away.

    i. <u>History and Characteristics of Ms. McDonald</u>

Savannah Danielle McDonald is the third of four children born to her parents, Daniel and Lisa. She was born in Athens, Georgia, and has spent her entire (almost) 22 years living in northeast Georgia. She is very close to her family, both emotionally and now physically. She is close emotionally because she grew up in a loving household, where she was supported by her parents and siblings, and she supported them in return. This close family manifests most obviously in the love, care and attention the family provides for Ms. McDaniel's brother, Daniel,

who goes by "Gage". Gage contracted meningitis when he was three months old, so severe he was in the hospital for approximately four months and was close to death. He survived, but the left side of his brain is mostly scar tissue. As a result, Gage has severely limited left-brain capacity. He is essentially unable to speak, communicating with a version of pidgin sign language. He has seizures, acts aggressively, lacks impulse control and recently was diagnosed with Obsessive-Compulsive Disorder. Although a year younger than Daniel, Savannah McDonald spent most of her childhood and youth helping care for her brother. That experience gave her a degree of empathy and maturity not shared by most of her peers.

Her father became disabled when Ms. McDonald was only six or seven years old. He owned a tree care business and fell from a tree while working. She remembers him coming home from the hospital in a full body cast, and she didn't recognize him. He broke he back, and has been unable to work since then, suffering debilitating pain in waves every day. Some days he can get around fine, others he walks with a permanent hunch in his back to relieve the pain. Ms. McDonald has spent her entire life with family members limited both mentally and physically by factors beyond their control. Her father's situation added to her understanding that everyone is likely dealing with their own problems, whether visible or not. These characteristics would come to bear throughout her life, including following January 6, 2021.

Ms. McDaniel's life has generally been a good one, and she has no complaints. She grew up in a loving family. She went to school, played sports, made friends and generally grew up in a stable, safe environment. She found out in high school that she had a talent for building things and welding. This led to her becoming a welder and earning a welding apprenticeship at the Caterpillar, Inc. factory nearby. She worked there as a welder for about six months through a cooperative education program within her high school and loved every minute of it.

Unfortunately, a previously undiagnosed asthma condition manifested amongst the various fumes present when welding, and she was forced to leave that work to save her health. Since she graduated high school, she has worked as a restaurant server, as a coffee barista and assistant manager, and currently as a server at a local bar and grill. She is living at home with her parents while she saves money to use as capitol to start her own wedding-planning and event business. She envisions the business owning the tents, tables, chairs and other items most commonly used when staging a wedding and reception, such that her business can not only help plan the wedding but assist with the staging as well. The idea for the business came to her sometime after her own wedding. She married very young, when she was 19, and remembers the effort and expense involved and thinking then there must be a better way to do it. She and her husband realized after a year or so that they shouldn't have gotten married and were both mature enough to come to that conclusion together and amicably divorce.

In short, she's a small-town girl with plans for living her life. She's not afraid of hard work and looks forward to finding her place in her community.

Notable in this context, Ms. McDaniel has absolutely no criminal history whatsoever. She has never been arrested or even received a traffic ticket. She turned herself in to the United States Marshal at the United States District Court in Macon, when informed of the charges against her and directed to appear at the courthouse. (ECF 5, 6) The government did not seek detention of Ms. McDonald then or at any time since. She was released on an unsecured bond of $25,000 subject the standard conditions of pretrial release pending her appearance before Magistrate judge in the D.C. District. (ECF 39) She made that appearance. There she was released on a personal recognizance bond, and again subject to the standard conditions of pretrial release. (ECF 12) Since that time she has been in perfect compliance with all conditions imposed

by the court. (ECF 31, 33)  Her lack of criminal history, and perfect compliance while on pretrial release are consistent with how she's lived her life. The only exception is January 6, 2022. But it is clear that day was an anomaly in an otherwise law-abiding life.

### ii. *Nature and Circumstances of the Offense*

The nature and circumstances of the offense conduct in Ms. McDonald's case present a unique situation for the court.  All of her conduct that day, both direct and relevant, was shared by thousands of others.  Yet, her individual conduct is what the court must consider when determining a reasonable sentence.  Nevertheless, the general events of the day almost certainly are necessary to provide context when considering Ms. McDonald individually.  Viewed through that lens, Ms. McDonald's individual conduct, while criminal and dangerous writ large, was not violent in any way. Ms. McDonald accepts full responsibility for her actions that day, and for the decisions she made.  The discussion below is in no way meant to minimize her conduct, but rather to place it into context for sentencing purposes.

Ms. McDonald traveled to Washington D.C. on January 5, 2021, with her boyfriend and two friends. They drove overnight from their homes in northeast Georgia, arriving early on the morning of January 6, 2021.  She made the decision to travel to Washington D.C. shortly before they left.  Ms. McDonald did not engage in any pre-rally activism, or post on social media any "we are coming to take back our government" messages such as those posted by  many others present on January 6.  On January 6, 2021, the political accoutrements she carried were  limited to a homemade poster and the ski hat bearing former President Trump's name and "2020".  She was not wearing body armor. She was not wearing any militaristic or tactical clothing. She carried no weapons at all. She carried no pepper spray or anything else that could have been used aggressively. They arrived before dawn on the morning of January 6, 2021 and found a place to

park their car as close to the capitol building. They gave out all but a few of the posters she had made.  They got coffee at a Starbucks and then spent hours walking around to visit all the monuments they could. Ms. McDonald remembers the World War II memorial most clearly, largely because she knew her father would love it and she wanted to be able to give him all the details she could.

They eventually made their way to the rally on The Ellipse near the White House simply by following "all the red hats" as she remembers it.  There were no signs, so they just followed the crowd.  Once they arrived there, they could see the stage in the distance, but had no idea what, if anything, was happening. As the crowd grew larger, Ms. McDonald grew nervous with the size, so she and Mr. Kidd backed out until they were on the fringes of the rear of the crowd.  Once the rally started, she could hear enough to hear that people were speaking, but couldn't actually hear their words, especially over the crowd noise.

At some point, the crowd began moving, walking East along Constitution Avenue, so Ms. McDonald and Mr. Kidd walked along with them.  At this point, the other two friends decided to go back to their car to sleep, tired from the all-night drive.  Ms. McDaniel and Mr. Kidd continued along with the crowd. They arrived at the U.S. Capitol building and stopped at the back of the crowd on the West Lawn.  After people at the front of the crowd crossed over the police line, the crowd surged forward as a whole. Ms. McDonald crossed the initial police line approximately four minutes after the first people crossed, walking up the Upper West Terrace Staircase to the terrace.  People forced open the Senate Wing Doors and entered the Capitol through those doors, followed by the crowd now massing on the terrace.  As people continued through the doors and began walking around the Capitol.  Approximately 3 minutes later, two people who entered through the breached Senate Wing Doors, while walking by, opened the

Senate Fire Door from inside.  Ms. McDonald and Mr. Kidd were walking by on the terrace when that door was opened and walked into the Capitol through that entrance.  Ms. McDonald did not force entry into the Capitol at any point and caused no damage to any doors or windows.

Once inside, Ms. McDonald and Mr. Kidd got on an elevator and first went to the basement before taking the elevator to the third floor.  Ms. McDonald was in the building for a total of approximately forty minutes.  Thirty of those minutes were spent sitting on a couch in the hallway on the second floor. Ms. McDonald at no point left the normally common hallway or rotunda areas. She did not enter the Senate Chamber, any offices nor did she attempt to.  After thirty minutes in the second-floor hallway, she and Mr. Kidd followed the directions of officers and left the Capitol building. Once outside, they walked around to the other side of the capitol building.  There were numerous news and media people present, and Ms. McDonald and Mr. Kidd agreed to be interviewed. During the interview, a person nearby could be heard discussing how people broke in, and Ms. McDonald responds clearly "We did not break in!".

Following that interview, they set about trying to connect with their friends.  They had received the curfew alert on their phones, and knew they had to leave the city.  They found a group leaving on a bus, who gave them a ride to a gas station in Virginia.  Once there, they called their friends who came and met them. The four then drove home to Georgia.  In the next few days, Ms. McDonald talked with her friends and family about what had happened and what she did.  At that point she felt that her actions were appropriate.  Over the next days as she followed the news coverage and learned more about the damage done to the Capitol building, the ransacking of offices, and the injuries, she began to regret her participation and shared her thoughts with her father. (FPSR ¶51) She also deleted her Snapchat social media account which

contained videos and photos of her time at the Capitol, all from January 6, 2021, and posted on or after January 6.

On January 16, 2021, FBI agents arrived at her home and asked to meet with her. Ms. McDonald agreed and told them about her experience at the capitol. This FBI interview was memorialized by the agents in the usual FBI fashion, a written "302" report. In that 302, the agents include Ms. McDonald's recitation of her conduct on January 6, 2021. (FPSR ¶23, ECF 1, p.6) Notably however, the agents did not include in their 302 Ms. McDonald's statement that "[t]his was a wake up call – won't do something like this again". That statement is however included in the contemporaneous notes taken by the agent at the time, and it very effectively summarizes the realization that she came to fairly quickly after January 6 and still holds to this day. (FPSR ¶30) She understands that while there is a place for political protest, there is also a proper way to do it. For her, that place is from her own home, in her community, in a respectful way. It is not what happened on January 6, 2021, in Washington, D.C.

Ms. McDonald's conduct before, on, and following January 6, 2021, is consistent with other similarly situated defendants who have received probationary sentences in relation to their conduct on January 6, 2021. She did not post anti-government messages on social media prior to January 6, 2021.While at the Capitol she did not break in or damage any part of the Capitol building. She did not take any property that did not belong to her, such as anything belonging to law enforcement. She did not leave what on a normal day would be commonly accessible areas. She did not assault or even confront anyone. She experienced the effects of the tear gas used by law enforcement but did so as a part of a large crowd. She, individually, was not targeted by law enforcement for anything she did that day. Ms. McDonald did not post on social media for general public consumption about her conduct or experiences that day, instead limiting her

discussion of her conduct to friends. She stopped talking to her friends about the events shortly after and asked that they delete any photos or videos of her they had. She expressed regret and remorse for her actions to her family shortly after returning to the FBI when interviewed on January 14, 2021, and to this court. (FPSR ¶30). She readily agreed to speak with law enforcement when contacted and submitted to the interview without counsel. To put it plainly, at the time she was interviewed by the FBI, she was scared. She told her friends that thinking about it made her chest hurt. In her interview she readily admitted her conduct, and described who she was with, how she traveled to the Capitol, when she got there, where she went inside the building and what she did (and didn't do) while she was there. Any misleading statements she made about the demeanor of the officers she encountered, while regrettable, were minor in importance compared to her otherwise complete admissions about her conduct. Any statements she made about her SnapChat account were mitigated by the fact that she immediately and readily gave the FBI her account name and information and posed no objection to them looking at her SnapChat information.

As time has passed, and she has had time to reflect on her actions she has had the chance to contextualize them for herself. She has had time to separate from the noisy chatter about the 2020 election and the events of January 6, 2021. She has come to understand what she did that day and how her participation, no matter how small, was significant and meaningful. And as she has expressed multiple times since, she has come to regret her participation. What she has been able to do is to show the court that her conduct on January 6, 2021, was an anomaly. A departure from how she ordinarily lives her life. She has shown the court by strictly adhering to the conditions of pretrial release, and otherwise leading a law-abiding life as a contributing member of her family and her community. All of these facts are consistent with other January 6

defendants who have received probationary sentences, which is what Ms. McDonald is requesting.

### c. 18 U.S.C. §3553(a)(2)

18 U.S.C. §3553(a)(2) requires the court to consider how the sentence imposed will adequately address a certain list of factors. The sentence should reflect the seriousness of the offense, promote respect for the law and provide just punishment. It should adequately deter Ms. McDonald and others from doing the same thing. If necessary, it should protect the public from Ms. McDonald, in the future. It should avoid unwanted sentencing disparities. And, if necessary, it should provide Ms. McDonald, with the necessary treatment in the most effective manner possible.

Ms. McDonald understands and accepts that there must be punishment for her conduct. She stands ready to accept the court's decision on what sentence is appropriate and reasonable considering these highly unusual circumstances. Ms. McDonald respectfully believes that a sentence of probation, along with a $500 restitution payment, and any additional fine or community service the court thinks is appropriate is a sentence sufficient, but not greater than necessary, to meet the requirements of §3553(a).

*Seriousness of the Offense*

Ms. McDonald understands the seriousness of the offense in this case. As she told her father, the FBI and this court: she knows there is an appropriate way to express protest with your government, and this was not it. The damage done to the Capitol building, the harm done to law enforcement and other Capitol staff, the fear instilled in those present inside doing their duty, all were far, far excessive. However, Ms. McDonald's behavior was minimal in nature and

comparison. She did not cause any damage. She did not confront, assault or harm anyone. She didn't force any doors or take anything she found inside the building.

A sentence of probation would be proportionate to Ms. McDonald's behavior in this case. The simple fact of a federal criminal conviction for her actions that day, standing alone, is extremely significant. Any financial penalty imposed would be significant for a young woman who works for tips with no salary or benefits at a local restaurant and lives at home with her parents while trying to save to start her own business. In short, a probationary sentence, in this case, would adequately address the seriousness of the offense. A sentence of imprisonment would be greater than necessary.

*Deterrence*

Ms. McDonald herself is deterred from this specific behavior in the future, and more generally any criminal behavior. She expressed that understanding in the days after January 6 to her father, and to the FBI when they interviewed her on January 14, 2021.

To the extent that anyone who would consider similar behavior in the future is paying attention to Ms. McDonald's case and her sentence, imposing a period of incarceration over probation here hardly seems likely to deter someone determined to do so.

*Protection of the Public*

Ms. McDonald has led a law-abiding life from the moment she reached the age of reason until today, but for her actions on January 6, 2021. The only "danger" she might theoretically pose to the public would be from similar activity in the future. However, that day was an aberration from how she normally conducts herself. Her own realizations, this prosecution, her conviction and a sentence of probation all combine to deter her from anything like this in the future. She poses no other danger to the public, and a period of incarceration is not necessary to

protect the public from Ms. McDonald. The deterrent effect of a probationary sentence is more than adequate. Incarceration would be greater than necessary.

### *Education, Training and Treatment*

Ms. McDonald is not in such need of any of these three things such that the court should consider the United States Bureau of Prisons as the only place she could get them.

### *Available Sentences*

The maximum term of imprisonment for the offense of conviction is six (6) months. If probation is imposed, the maximum term that can be imposed is five (5) years. A special assessment of $10.00 must be imposed and the maximum fine is $5,000.00. Ms. McDonald has agreed to make $500 restitution payment. If a sentence of imprisonment is imposed, no period of supervised release can be imposed. Ms. McDonald believes that a period of probation, any fine or community service the court feels is appropriate along with the $500 restitution payment Ms. McDonald has agreed to, is sufficient, but not greater than necessary in this case.

### *Need to Avoid Sentencing Disparities*

As of the date of this sentencing, there will have been approximately two hundred defendants sentenced for their conduct on and around January 6, 2021. Without detailing all of them, a review makes clear that defendants who are similarly situated to Ms. McDonald have received probationary sentences rather than incarceration sentences. That is, defendants with no criminal history who entered the Capitol but did no damage, stole nothing, nor confronted or assaulted anyone and then left have generally been receiving probationary sentences. Ms. McDonald believes that a probationary sentence is similarly appropriate for her in this case as well. She is confident that this court is well aware of the sentences it, along with the other

judges in this district, has imposed in January 6 cases, and is confident the court will avoid giving her a disparate sentence.

### III. Conclusion

Ms. McDonald comes humbly before the court as part of an unprecedented event in United States history. She never made any advance plans to be part of what happened on January 6, 2021, at the U.S. Capitol other than to decide to go.  Once there, and after others broke through police lines and into the Capitol, she decided to follow. She did no damage while there. She confronted nor assaulted anyone while there. She took nothing while she was there.  She knows what she did was wrong. She has pleaded guilty to the offense, and accepted responsibility for her actions. She simply comes now asking the court for a sentence which is sufficient, but not greater than necessary, to meet the statutory requirements of 18 U.S.C. §3553(a).  Based on her conduct before, during and after January 6, and in comparison with other similarly situated defendants, a term of probation rather than incarceration is just such a sentence.

WHERFORE, Ms. McDonald respectfully requests the Court grant her motion and impose a sentence as requested.

Respectfully submitted this 3rd day of Mary, 2022.

/s/**Timothy R. Saviello**
Timothy R. Saviello
Ga. Bar No. 627820
Attorney for Defendant
Federal Defenders of the
Middle District of Georgia, Inc.
440 Martin Luther King Jr Blvd, Ste 400
Macon, Georgia 31201
Tel: (478) 743-4747
Fax: (478) 207-3419
Email: tim_saviello@fd.org

## CERTIFICATE OF SERVICE

I, Timothy R. Saviello, hereby certify that on May 3, 2022, I electronically filed the foregoing pleading with the clerk of Court using the CM/ECF system which will send notification of such record of counsel.

/s/**Timothy R. Saviello**
Timothy R. Saviello
Ga. Bar No. 627820
Attorney for Defendant
Federal Defenders of the
Middle District of Georgia, Inc.
440 Martin Luther King Jr Blvd, Ste 400
Macon, Georgia 31201
Tel: (478) 743-4747
Fax: (478) 207-3419
Email: tim_saviello@fd.org